IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 02-22778-CIV-MOORE

MICCOSUKEE TRIBE OF INDIANS
OF FLORIDA, a federally-recognized Indian tribe,

    Plaintiff,

vs.

UNITED STATES OF AMERICA, U.S. ARMY
CORPS OF ENGINEERS, et al.,

    Defendants.
_____/

**CLOSED CIVIL CASE**

## ORDER DENYING PLAINTIFF MICCOSUKEE TRIBE'S MOTION TO FIND FSEIS INADEQUATE AND RESPONSE TO COURT'S MARCH 6, 2007 ORDER

THIS CAUSE came before the Court upon the Plaintiff Miccosukee Tribe's Motion to Find FSEIS Inadequate and Response to Court's March 6, 2007 Order (DE # 291). Both Federal Defendants and the Intervenors filed responses in opposition to Plaintiff's motion (DE # 298 and 297, respectively) and the Plaintiff filed a reply to each response (DE # 302 and 301, respectively).

UPON CONSIDERATION of the motion, and the Court being fully advised in the premises, this Court enters the following Order.

### I. BACKGROUND

Plaintiff Miccosukee Tribe ("Plaintiff") and the Natural Resources Defense Council, Florida Wildlife Federation,[1] Izaak Walton League of America, National Parks Conservation Association, National Wildlife Federation, Sierra Club and the Cape Sable seaside sparrow (the

---

[1] The Florida Wildlife Federation was dismissed from this action on March 7, 2006 (DE #247).

"Sparrow"),[2] *Ammodramus Maritima Mirabilis*[3] (collectively, "Intervenors") challenge a series of water management decisions by the U.S. Army Corps of Engineers (the "Corps") designed to avoid jeopardy to the endangered Cape Sable seaside sparrow (the "Sparrow") in the Everglades National Park (the "Everglades") while administering a number of Congressionally authorized programs aimed at balancing the water-related needs of South Florida.

In 1948, Congress authorized the Central and Southern Florida Project for Flood Control and Other Purposes ("C & SF Project"). The purpose of the C & SF Project was to control water flows and levels in South Florida and the Everglades. The C & SF Project provides both flood protection and water supply for the developed areas of South Florida through the use of, among other things, the South Dade Conveyance System ("SDCS") -- a series of canals, levees and water control structures. Water Conservation Area 3-A ("WCA-3A") is an Everglades marsh comprising in excess of 100,000 acres in Miami-Dade and Broward counties that is part of the C & SF Project area. The C & SF Project also affects an area in Miami-Dade County known as the 8.5 Square Mile Area, the Miccosukee Reserved Area, and the Plaintiff's reservations located along Tamiami Trail and Krome Avenue. In order to maintain "acceptable" water levels in WCA-3A, the Water Control Plan and Regulation Schedule guides water managers charged with regulating inflow and outflow of water through the various water control structures within WCA-3A. The Corps and its local sponsor, the South Florida Water Management District ("SFWMD") operate the C & SF Project pursuant to the water regulation schedules.

Following unanticipated environmental consequences, particularly higher water levels in the western part of the Everglades and the drainage of marsh in the eastern half of the Everglades, Congress authorized the Corps and the SFMWD in 1984 to experiment with

---

[2] According to the U.S. Fish & Wildlife Service, Cape Sable seaside sparrows are small birds about 13 centimeters or 5 inches long that are primarily found in southern Florida.

[3] The Cape Sable seaside sparrow, *Ammodramus Maritima Mirabilis*, did not have standing to serve as a named Intervenor in this action and was previously dismissed.

2

different methods of delivering water to the Everglades that resulted in better distribution of the water between different areas of the Everglades. Pub. L. No. 101-229, 103 Stat. 1946 (Dec. 13, 1989) (codified at 16 U.S.C. § 410r-5 tp 410r-8). This experimentation appeared to have two consequences: First, it led to Congressional authorization of the Modified Water Deliveries Project (the "MWD") which calls for the construction of new water control structures in the northern part of the Everglades; and second, it allowed to Corps to operate different water delivery methods and study their impacts on the Everglades's ecology. Among the water delivery methods employed was "Test 7," which governed water delivery methods in the Everglades from 1995-1999.

Test 7, however, had consistent negative effects on the Sparrow population of the Everglades, leading to the U.S. Fish and Wildlife Service ("FWS") to ask the Corps to reduce water levels in the Sparrow's western nesting habitat in order to increase the probability of successful breeding for that year. The Corps requested and received approval from the Council on Environmental Quality ("CEQ") for emergency alternative arrangements pursuant to the National Environmental Policy Act ("NEPA") and deviated from its Test 7 operations. In February 1999, the FWS issued a final Biological Opinion ("BO") on the effects of Test 7 and other programs on several species, including the Snail Kite. The BO concluded, among other things, that the continued operation of Test 7 would lead to the extinction of the Sparrow. In keeping with that conclusion, the FWS provided a "Reasonable and Prudent Alternative" ("RPA") identifying actions that the FWS believed would protect the Sparrow from further danger until the MWD was completed. In December 1999, in response to the BO, the Corps issued the Interim Structural Operating Plan ("ISOP"). Although the ISOP did not include many of the RPA's water management components, the Corps asserted that the ISOP would produce hydrologic conditions equivalent to the RPA. The ISOP directed the closure of certain structures that had the effect of increased water levels in the WCA-3A. The Corps sought and received emergency authorization from CEQ to prepare an Environmental Assessment ("EA") pursuant to

NEPA after the initial implementation of ISOP. The consequence of increased water levels was predicted in a draft EA issued in January 2000, followed by a final EA issued in March 2000. CEQ also directed the Corps to prepare a full Environmental Impact Statement ("EIS") for a new, longer term plan, the Interim Operating Plan ("IOP"), that would replace the ISOP and remain in place until completion of the MWD Project. In December 2000, after consultation with CEQ, the Corps issued a revised and updated ISOP ("ISOP 2001").

After a notice and comment period, the Corps issued a Draft Environmental Impact Statement ("DEIS") on the IOP in February 2001. The DEIS assessed six alternatives, including the ISOP 2001, with Alternative 5 as the preferred choice. Public reception led to another round of mediation through the Institute for Environmental Conflict Resolution ("IECR") in order to select a plan for the IOP. After the public comment period on the DEIS ended, the Corps began a series of meetings with various federal and non-federal groups (including the FWS, the Corps, Everglades National Park, and the South Florida Water Management District ("SFWMD")) for the purpose of selecting and recommending a plan for the IOP. To that end, this advisory body selected Alternative 7 as the preferred plan and issued a Supplemental Draft Environmental Impact Statement ("SEIS"). The Corps again took public comments on the SEIS. In December 2001, SFWMD withdrew from the agreement on Alternative 7. In response to this withdrawal, the Corps resumed mediation and developed "Alternative 7R." Alternative 7R contained new operational structures and features that were not included in the SEIS, such as the addition of two large pumps; removal of the southernmost four miles of the L-67 extension levee; and the construction of various seepage reservoirs. In April, 2002, FWS issued an amended Biological Opinion on Alternative 7R that predicted that IOP 7R would degrade 88,300 acres of snail kite critical habitat in WCA-3A. In May 2002, the Corps issued a Final Environmental Impact Statement ("FEIS") recommending Alternative 7R as the Final Recommended Plan. On July 3, 2002, the Corps issued a Record of Decision adopting the Final Recommended Plan.

On September 20, 2002, Plaintiff filed a Complaint alleging violations of the National

4

Environmental Policy Act ("NEPA") and the Endangered Species Act ("ESA"), improper agency action under the Administrative Procedure Act ("APA"), violations of the rulemaking provisions of the APA, violations of the Fifth Amendment guarantee of due process, nuisance under federal common law, violation of the Indian Trust doctrine, as reflected in the Florida Indian Land Claims Settlement Act of 1982, violations of the Federal Advisory Committee Act, and improper delegation of agency authority, all stemming from allegedly improper action by the Corps in adopting and implementing the IOP. Three of Plaintiff's counts were dismissed, leaving six counts remaining. See DE #142. Motions and Cross-motions for Summary Judgment were filed (DE # 163, 167, 172, 188), resulting in this Court granting summary judgment to the Plaintiff on Count I of the Plaintiff's Complaint, and to the Federal Defendants on the rest of the remaining counts and cross-claims (DE # 248).

In its Order on summary judgment, this Court found that "the failure of the Corps to prepare a SEIS, with hydrologic modeling results and interpretation of the modeling stemming from the introduction of Alternative 7R, was arbitrary and capricious." Order of March 15, 2006 (DE # 248) (the "Order") at 13. The changes implemented by the adoption of Alternative 7R were significant, and the "Corps violated NEPA by failing to issue a SEIS after adopting Alternative 7R." Id. at 32. The Corps was accordingly ordered to "issue a Supplemental Environmental Impact Statement" to repair these deficiencies. Id. at 32-33.

The Corps filed a notice of availability of the Final Supplemental Environmental Impact Statement ("FSEIS") on December 21, 2006 (DE # 286). On March 6, 2007, this Court filed an Order requiring the parties to file responses describing any issues remaining for resolution. (DE # 288). In response, Plaintiff filed the instant motion, asking the Court to find the FSEIS inadequate and "enjoin the Corp from continuing to implement IOP and specifically enjoin the Corps from closing the S-12 gates when water levels in WCA-3A are in excess of 10.5 feet." Pl. Mot. at 20.

5

## II. STANDARD FOR A PERMANENT INJUNCTION

Generally, in order to be entitled to a permanent injunction, a plaintiff must show: (1) success on the merits; (2) a substantial threat that the plaintiff will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the plaintiff will outweigh any threatened harm the injunction may do to defendant; and (4) granting the permanent injunction will not disserve the public interest. Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000); Clark Const. Co., Inc. v. Pena, 930 F. Supp 1470, 1477 (M.D. Ala. 1996).

## III. DISCUSSION

As a threshold matter, Plaintiff asserts that this "Court clearly has jurisdiction to review the [F]SEIS filed pursuant to its Court Order," and argues that Federal Defendants' failure to complete the ROD illustrates their failure to comply with this Court's Order, therefore (among other reasons) a temporary injunction should be issued to keep the Corps from operating under the FEIS which was the subject of the original Complaint in this action. Pl. Reply to Def. at 2. Federal Defendants claim Plaintiff may not challenge the substance of the FSEIS as sovereign immunity is waived, for purpose of this motion, by the Administrative Procedure Act ("APA") and that the APA limits review to "final agency action." Def. Resp. at 4-5, quoting 5 U.S.C. § 704. citing Lujan v. National Wildlife Federation, 497 U.S. 871, 882 (1990) and National Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1236 (11th Cir. 2003). Federal Defendants point out that the Corps has not yet completed its decision making process and issued a final Record on Decision (ROD) and "taken final action with respect to the FSEIS." Def. Resp. at 4.

According to the Supreme Court, "NEPA itself does not mandate particular results, but simply prescribes the necessary process." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989). "[P]reliminary, procedural, or intermediate agency action," such as the FSEIS, is "not directly reviewable" under the Administrative Procedure Act. 5. U.S.C. § 704. The ROD would be the final agency action which would be subject to the sort of review sought

6

by the Plaintiff. See 40 C.F.R. § 1505.2. Additionally, on remand, the Corps is only required to cure the deficiencies expressly identified by the Court. See Heartland Reg'l Med. Ctr. v. Leavitt, 415 F.3d 24, 29 (D.C. Cir. 2005). Accordingly, this Court will limit its review of the FSEIS to a determination of whether the Corps' actions satisfy this Court's Order, which instructed the Federal Defendants to "prepare a SEIS, with hydrological modeling results and interpretation of the modeling stemming from the introduction of Alternative 7R." Order at 13.

Plaintiff claims that the FSEIS produced by the Federal Defendants is insufficient because the Corp did not follow the requirements of the National Environmental Policy Act ("NEPA").

### 1) The Alternatives Analysis is Sufficient.

Plaintiff claims that the FSEIS does not include "mandatory analysis of alternatives using updated modeling and a cumulative impacts analysis" "which is the heart of an EIS." Pl. Mot. at 2, 4. The FSEIS refers back to the 2002 Final FEIS, the subject of the Complaint in this action, for the detailed analysis of other alternatives. Pl. Mot. at 8. Incorporating the work already done, the FSEIS includes the mandatory analysis. Plaintiff argues that reliance on the older analysis of alternatives, based on then-available modeling, is inappropriate, and that the FSEIS should include a re-evaluation of those alternatives based on the most current models. Id. at 5. Revising the models was not ordered by this Court, which only required the Federal Defendants to repair the deficiency in the FEIS by adding an analysis of Alternative 7R. They were not required to revisit the modeling of alternatives which had already "been rejected as unacceptable . . . through the collaborative interagency process facilitated by the Institute for Environmental Conflict Resolution." Def. Resp. at 298.

### 2) The FSEIS Uses the Proper "No Action Alternative."

Plaintiffs claim that the FSEIS fails to satisfy the Order because "[i]n the FSEIS, Alternative 7R is both the Recommended Plan and the No Action Alternative, which the impacts of 7R are supposed to be measured against." Pl. Mot. at 5. Plaintiff argues that "[w]henever changed circumstances occur, NEPA 'obliges an agency to revisit its alternatives analysis,

including a true no action alternative.'" Id. at 10, quoting Oregon Natural Resources Council Action v. United States Forest Serv., 445 F.Supp.2d 1211, 1224 (D. Or. 2006). Plaintiff suggests that the no action alternative which ought to have been compared to Alternative 7R was the "Test 7 program in place before any deviations." Pl. Mot. at 10. Federal Defendants claim that Alternative 7R was the proper no action alternative, because they were required to compare the recommended plan to the current operating plan, and 7R is currently in use. Def. Mot. at 11. Accordingly, Federal Defendants claim it would be inappropriate to use the Test 7 program because it was not currently in use. Id. The intent of the no action alternative is to require a comparison between the "potential impacts of the proposed . . . action to the known impacts of maintaining the status quo . . . . In other words, the current level of activity is used as a benchmark." Custer County Action Ass'n v. Garvey, 256 F.3d 1024, 1040 (10th Cir. 2001). Here, the current level of activity is Alternative 7R, so the Federal Defendants did not err in using Alternative 7R as the no action alternative.

### 3) The Analysis of Cumulative Impacts in the FSEIS is sufficient.

Plaintiff claims that the section of the FSEIS on cumulative impacts is abbreviated and fails to satisfy the NEPA requirements. Pl. Mot. at 11. Plaintiff further argues that if a proper cumulative impact analysis was performed, it would show that the impact of the plan on the Snail Kite and WCA 3A in general would be permanent and irreversible damage, rather than a temporary adverse impact, which was suggested by the FSEIS. Id., quoting FSEIS at 86-87, Section 4.19. Federal Defendants point to the 2006 Biological Opinion (BiOpp) appended to the FSEIS, and argue that the analysis of the cumulative impacts in the FSEIS and the BiOpp satisfies NEPA's requirements. Def. Resp. at 11, citing 40 C.F.R. § 1508.25, 1508.7. Plaintiff criticizes the brevity of the analysis in the FSEIS, but fails to acknowledge the extended analysis of the cumulative impacts in the attached BiOpp, except to argue that the Corps' reliance on the Biological Opinion is inappropriate, and that the Corps should have conducted its own analysis Pl. Mot. at 15, citing Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv., 281 F. Supp.2d 1, 25

8

(D.D.C. 2003). Hawaii Longline Association, however, merely holds that reliance on a Biological Opinion may not be "arbitrary or capricious." Id., quoting Pyramid Lake Paiute Tribe of Indians v. United States Dept. of Navy 898 F.2d 1410, 1415 (9th Cir. 1990) Federal Defendants point to the years of consultation and cooperation with the FWS which preceded the FSEIS, and the analysis in the FSEIS of the potential impact on water quality. Def. Resp. at 13. Accordingly, this Court finds that Federal Defendants' use of the BiOpp is appropriate, being neither arbitrary nor capricious. Upon a review of the BiOpp, this Court also finds that the analysis in the FSEIS, including the attached BiOpp, is sufficient, and Plaintiff's argument must fail.

### 4) Whether the FSEIS Fails to Avoid and Mitigate Harm to Tribal Everglades and the Snail Kite is Not at Issue.

Plaintiff argues that the FSEIS fails to avoid or mitigate harm to Tribal Everglades and the Snail Kite. Pl. Mot. at 12-14. Plaintiff also generally challenges the conclusions of the FSEIS that Alternative 7R provides "the best practicable means to minimize or avoid adverse impacts." Id. at 12-14, quoting FSEIS at Appendix F, FWS BO at 77. The outcome of the analysis is not at issue here. The issue before this Court, as described above, is whether the Federal Defendants properly followed this Court's prior Order.

### 5) FSEIS Sufficiently Analyzes R Structures

Plaintiff argues that the analysis of the new structures proposed by Alternative 7R is also insufficient. Pl. Mot. at 14. Plaintiff claims that the Corps has not collected enough data and performed the proper analysis, and that the proposed field testing of the structures should not be allowed in the Everglades, as the field testing could affect the project area and the local species. Id. at 14-15. Federal Defendants counter that they have "thoroughly addressed the impacts of the R structures" and point out that the impacts have been modeled "to the extent practicable," explaining that certain data can only be collected and adjustments implemented in the field. Def. Resp. at 12. After a review of the FSEIS, this Court concurs, and finds that the Federal

9

Defendants performed sufficient analysis to fulfill the requirements of this Court's prior Order.

## IV CONCLUSION

For the reasons described above, it is hereby

ORDERED AND ADJUDGED that Plaintiff Miccosukee Tribe's Motion to Find FSEIS Inadequate (DE # 291) is DENIED. Plaintiff has failed to show the FSEIS is inadequate, a prerequisite for the injunction Plaintiff seeks. As no other issues remain for resolution by this Court, according to the responses to this Court's Order Requiring Response (DE # 288), this case is hereby CLOSED.

DONE AND ORDERED in Chambers at Miami, Florida, this 30th day of July, 2007.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc: All counsel of record